# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **CARL W. EVANS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:05cv00052 |
| | ) | **MEMORANDUM OPINION** |
| **JO ANNE B. BARNHART**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration consistent with this Memorandum Opinion.

## I. Background and Standard of Review

Plaintiff, Carl W. Evans, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq*. (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

Case 1:05-cv-00052-PMS   Document 27   Filed 02/28/06   Page 1 of 24   Pageid#: 99

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Evans protectively filed his applications for DIB and SSI on or about September 5, 2002, alleging disability as of June 30, 1998, based on difficulty standing, walking and climbing and constant knee and hip pain. (R. at 66-69, 95, 130, 199-201.) The claims were denied initially and upon reconsideration. (R. 33-35, 38, 39-41.) Evans then requested a hearing before an administrative law judge, ("ALJ"). (R. at 42.) The ALJ held a hearing on December 11, 2003, at which Evans was not represented by counsel. (R. at 204-65.) A supplemental hearing was held on October 5, 2004, at which Evans was again unrepresented. (R. at 266-324.)

By decision dated March 8, 2005, the ALJ denied Evans's claims. (R. at 20-30.) The ALJ found that Evans met the disability insured status requirements of the Act for disability purposes through the date of her decision. (R. at 29.) The ALJ found that Evans had not engaged in substantial gainful activity since June 30, 1998. (R. at 29.) The ALJ also found that the medical evidence established that Evans suffered from severe impairments, namely post ankle fracture, arthritis, left knee problems, mild tennis elbow, mild crepitus of the right knee and back problems, but she found that Evans did not have an impairment or combination of impairments listed at or

Case 1:05-cv-00052-PMS   Document 27   Filed 02/28/06   Page 2 of 24   Pageid#: 100

medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 29.) The ALJ found that Evans's allegations regarding his limitations were not totally credible. (R. at 29.) The ALJ found that Evans retained the residual functional capacity to perform light[1] work that allowed him to occasionally make postural adaptations diminished by a limited ability to use the lower extremities and knees and a limited ability to climb ladders, ropes and scaffolds. (R. at 29.) Thus, the ALJ found that Evans was unable to perform any of his past relevant work. (R. at 29.) The ALJ found that, based on Evans's age, education and past work experience and the testimony of a vocational expert, Evans could perform jobs existing in significant numbers in the national economy, including those of a taxi driver, a watchman/night guard, a parking lot attendant, a file clerk and a general office clerk. (R. at 29-30.) Therefore, the ALJ found that Evans was not disabled under the Act and was not eligible for benefits. (R. at 30.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

After the ALJ issued her decision, Evans pursued his administrative appeals, (R. at 9), but the Appeals Council denied his request for review. (R. at 6-8.) Evans then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). The case is before this court on Evans's motion for remand filed December 9, 2005, and on the Commissioner's motion for summary judgment filed February 10, 2006.

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005).

-3-

## II. Facts

Evans was born in 1965, (R. at 216), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a ninth-grade education and past work experience as a tree trimmer/cutter and a taxi driver. (R. at 101, 112, 220.)

Evans testified that he last worked in December 2001[2] as a tree trimmer/cutter for a company with a contract with the Virginia Department of Transportation. (R. at 221.) He testified that he was laid off after the contract ended. (R. at 221.) Evans testified that he missed approximately two to three days of work each month due to doctor's appointments for leg pain. (R. at 228.) He testified that he also had worked as a taxi driver for railroad engineers, but lost that job after taking pain medication for knee pain, which was against company policy. (R. at 221-22.) Evans testified that he collected unemployment benefits for approximately seven months, during which time he searched for other employment, but was unable to obtain such. (R. at 224.)

Evans testified that he suffered from low back and hip problems, for which he went to the emergency department for treatment and medication. (R. at 228-29.) He stated that he had seen no specialists. (R. at 229.) He further stated that x-rays of his back yielded no abnormal results. (R. at 233.) Evans testified that approximately 15 x-rays of his legs had been taken since 1998, but no abnormalities were found. (R. at 229.) He testified that he was told he needed to undergo an MRI, which he could not afford. (R. at 230.) Evans stated that he was diagnosed with some type of progressive arthritis of the legs in June 2003 and was given Vioxx, which did not help. (R. at 237-

---

[2]At his subsequent October 2004 hearing, Evans testified that he was laid off in September 2001. (R. at 280.)

38.) He testified that he also experienced problems with his right elbow, noting that it would grind when he lifted objects. (R. at 234.) However, he again noted that x-rays revealed no abnormalities. (R. at 234.) Evans stated that although he fractured his ankle in November 2002 after falling, he underwent no physical therapy because he had no insurance. (R. at 235-36.) Evans testified that, at the time of the hearing, he was taking only aspirin. (R. at 237.) He stated that he drank approximately one pint of whiskey per month and had last used marijuana socially in 2000 or 2001. (R. at 243-45.)

Dana Fitzko, Evans's fiancee, also was present and testified at Evans's initial hearing. (R. at 249-64.) Fitzko testified that Evans attended community college classes for one day as a prerequisite to obtaining food stamps. (R. at 251-52.) However, she stated that he did not return because the car they shared broke down. (R. at 253.) She stated that Evans was unable to perform household chores due to his physical impairments. (R. at 254.) She stated that they stayed home and watched television and had friends over to their house. (R. at 255.) Fitzko testified that Evans went to the emergency department for knee and hip pain, and she further stated that he took pain medication for these problems, although she was unsure of the specific medication. (R. at 257.) She estimated that Evans could sit for two to four hours without interruption. (R. at 259.) Fitzko stated that Evans experienced leg numbness in the mornings and that his legs sometimes gave way. (R. at 259-60.) She stated that Evans fell approximately a year previously and fractured his ankle after his knees gave way. (R. at 260.)

A supplemental hearing was held on October 5, 2004, at which Evans was again unrepresented. (R. at 266-324.) At that time, Evans testified that the last physician

he saw was Dr. Litz in May 2003.  (R. at 272-73.)  He stated that Dr. Litz prescribed Lortab for eight months.  (R. at 284-85.)  He further testified that he had not looked for work since the previous hearing.  (R. at 286.)  He stated that, since that time, his left elbow had begun hurting and that he staggered more when he walked.  (R. at 286.)  Although Evans testified that he used a cane at home, he stated that no physician had prescribed such use of a cane.  (R. at 287.)  Evans stated that pushing and pulling caused a tingling sensation and pain in the back of both elbows.  (R. at 288.)

Evans testified that he watched television, performed minor home repairs, occasionally played chess and cards, read the newspaper, watched movies and occasionally cooked and did laundry.  (R. at 291-92.)  He further testified that he had cut back on his alcohol consumption since his previous hearing.  (R. at 294-95.)  Evans testified that, even if he were able to get his previous job as a tree trimmer/cutter back, he could not perform it because it was too strenuous.  (R. at 299-300.)

Dr. Ward Stevens, M.D., a medical expert, also was present and testified at Evans's supplemental hearing.  (R. at 305-14.)  Dr. Stevens testified that the medical evidence of record supported diagnoses of a lax anterior cruciate ligament of the right knee, status post right ankle fracture, mild tennis elbow of the right elbow and mild crepitus of the right knee.  (R. at 308-12.)  He concluded that Evans could perform work at the light and sedentary[3] levels of exertion.  (R. at 312.)  Dr. Stevens opined that Evans's impairments did not meet or equal any of the medical listings.  (R. at

---

[3]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools.  *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2005).

314.)  He agreed with the limitations set forth in state agency physician Johnson's Physical Residual Functional Capacity Assessment, dated April 9, 2003.  (R. at 180-87, 312, 314.)[4]

James Williams, a vocational expert, also was present and testified at Evans's supplemental hearing.  (R. at 314-23.)  He classified Evans's past work as a tree trimmer/cutter as heavy[5] and semiskilled and as a taxi driver, generally, as medium[6] and semiskilled, but as testified to by Evans, as sedentary and semiskilled.  (R. at 316.)  Williams was asked to consider an individual with the limitations set forth in Dr. Johnson's April 2003 assessment.  (R. at 180-87, 317.)  Williams testified that such an individual could perform the job of a taxi driver as testified to by Evans, as a watch guard, a night watchman, a parking lot attendant, a file clerk, a general office clerk and a cashier.  (R. at 317-21.)

In rendering her decision, the ALJ reviewed records from Dr. Yogesh Chand, M.D.; Bluefield Regional Medical Center; Tazewell Community Hospital; Dr. Edward M. Litz, M.D.; Dr. Edward Hunter, M.D.; Dr. Frank M. Johnson, M.D., a state agency physician; and Dr. Richard M. Surrusco, M.D., a state agency physician.  Evans later

---

[4]Dr. Stevens actually testified that he agreed with state agency physician Surrusco's assessment.  (R. at 312, 314.)  However, a check of the record reveals that the assessment was actually completed by Dr. Johnson and later affirmed by Dr. Surrusco.  (R. at 187.)

[5]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds.  If someone can perform heavy work, he also can perform medium, light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2005).

[6]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If someone can perform medium work, he also can perform light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2005).

obtained counsel, who submitted additional medical records from Bluefield Regional Medical Center to the Appeals Council.[7]

Evans presented to the emergency department at Tazewell Community Hospital on April 27, 1999, with complaints of back pain radiating into the legs for the previous three weeks. (R. at 157-60.) He described the pain as sharp and aggravated by sitting upright and with movement. (R. at 157.) Straight leg raising was negative, Evans exhibited no apparent motor or sensory deficit and his reflexes were normal. (R. at 158.) Evans's extremities were normal and he had no pedal edema. (R. at 158.) He was diagnosed with low back pain and was given Toradol. (R. at 158, 160.)

Evans saw Dr. Yogesh Chand, M.D., an orthopaedist, from July 28, 1999, through August 16, 2000, with complaints of knee problems. (R. at 140-46.) On July 28, 1999, Evans reported twisting his right knee the previous week. (R. at 144.) He reported a moderate amount of pain and swelling and was unable to fully bear his weight. (R. at 144.) He further reported feeling a "looseness" in his knee when not wearing a brace, but denied numbness or tingling in the leg or problems with the right hip. (R. at 144.) A physical examination revealed right hip movement without pain, but a grade II to III effusion of the right knee. (R. at 144.) The collateral ligament showed grade I laxity. (R. at 144.) Dr. Chand noted that the rest of the knee was unremarkable, as was the distal neurovascular function of the right leg. (R. at 144.) X-rays of the right knee yielded normal results. (R. at 144.) Evans was diagnosed with a tear of the anterior cruciate ligament with posterior lateral corner sprain

---

[7]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 6-8), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Case 1:05-cv-00052-PMS   Document 27   Filed 02/28/06   Page 8 of 24   Pageid#: 106

syndrome and possible internal derangement. (R. at 144.) Evans did not wish to pursue further testing or physical therapy due to a lack of insurance. (R. at 144.) Dr. Chand discussed daily exercises and the use of a knee immobilizer. (R. at 144.) He was advised not to return to work for three months. (R. at 144.) On March 29, 2000, Evans complained of twisting his left knee after it gave way. (R. at 143.) He described an aching and throbbing pain, especially at night, but denied numbness or tingling of the legs, back or left hip symptoms. (R. at 143.) Dr. Chand noted that Evans had recovered from the sprain of his right knee without residuals. (R. at 143.) A physical examination revealed an unremarkable right knee, but the left knee showed a grade I to II effusion and tenderness along the medial joint line. (R. at 143.) The patellafemoral joint was mildly tender, but stable. (R. at 143.) Distal neurovascular function of the left leg was normal. (R. at 143.) X-rays of the left knee yielded normal results. (R. at 143.) Dr. Chand diagnosed a sprain of the left knee with internal derangement and advised Evans to obtain MRI studies and surgical treatment. (R. at 143.) Evans declined. (R. at 143.) He was given a physical therapy prescription, was advised to start a range of motion and strengthening program and was given Lortab for pain. (R. at 143.)

On April 21, 2000, Evans continued to complain of a moderate amount of pain in the left knee. (R. at 142.) Dr. Chand noted that Evans lacked five degrees of extension in the left knee with pain. (R. at 142.) However, Evans was less unstable, and his flexion was near normal. (R. at 142.) Distal neurovascular function was normal, but Evans continued to limp. (R. at 142.) Dr. Chand recommended investigative studies or arthroscopic surgery of the knee, but Evans stated that he could not afford to do so. (R. at 142.) He was again prescribed Lortab. (R. at 142.) On June 7, 2000, Evans continued to complain of left knee pain and noted that he was

trying to obtain assistance to proceed with arthroscopic surgery. (R. at 141.) He reported episodes of his knee giving way and swelling. (R. at 141.) A physical examination showed no effusion of the left knee. (R. at 141.) However, Dr. Chand noted that he could not "click" the knee and that the patellafemoral joint was normal. (R. at 141.) The rest of the left leg was normal, as was Evans's gait. (R. at 141.) Dr. Chand opined that Evans had some sort of internal derangement within the left knee and again recommended surgical treatment. (R. at 141.) He released Evans to sedentary work. (R. at 141.) On August 16, 2000, Evans continued to have knee problems, but without locking. (R. at 140.) He was again given Lortab. (R. at 140.) Dr. Chand advised Evans to learn to live with this problem since he could not continue to prescribe pain medication. (R. at 140.) He advised Evans to return if he wished to pursue surgical intervention. (R. at 140.) Dr. Chand further advised Evans to pursue a job that allowed him to sit. (R. at 140.)

Evans presented to the emergency department at Bluefield Regional Medical Center on June 13, 2001, with complaints of pain in the right knee after twisting it at work. (R. at 147-48.) A physical examination revealed slight swelling of the medial knee without discoloration, increased pain with extension and weight bearing and decreased pain with flexion. (R. at 147.) Evans was able to move his toes without difficulty. (R. at 147.) The pain was confined to Evans's right medial knee without radiation. (R. at 147.) X-rays revealed no fracture or dislocation. (R. at 149.) Evans was diagnosed with a right knee injury and was given Lortab and Fioricet. (R. at 147.) He also was given a knee immobilizer and crutches, was advised against weight bearing and was advised to elevate the knee and use ice intermittently. (R. at 147-48.) Evans was discharged in stable condition. (R. at 148.) Evans again presented to the emergency department on December 9, 2001, with complaints of bilateral knee pain.

-10-

(R. at 150-51.)  It was noted that Evans ambulated without difficulty.  (R. at 150.)  However, gross degenerative changes were noted visibly on external physical examination of both knees.  (R. at 150.)  There was some discomfort to palpation, but no redness, erythema or gross effusions.  (R. at 150.)  No crepitus or deformity was noted.  (R. at 150.)  A distal neurovascular examination was intact, and proximal leg examinations were normal.  (R. at 150.)  Evans was offered x-ray studies, but declined.  (R. at 150.)  He was diagnosed with suspected arthralgias of both knees.  (R. at 150.)  He was given a Toradol injection and a prescription for Motrin and Lortab.  (R. at 150-51.)

Evans again presented to the emergency department at Tazewell Community Hospital on January 8, 2002, with complaints of right elbow pain after chopping wood the previous day.  (R. at 153-56.)  He described the pain as mild to moderate and exacerbated by movement.  (R. at 154.)  A physical examination revealed a normal range of motion of the extremities with no edema.  (R. at 154.)  Evans was diagnosed with muscle strain of the right elbow area.  (R. at 153.)  He was advised to alternate ice and warm compresses.  (R. at 153.)  He also was given Naprosyn.  (R. at 153.)

Evans presented to the emergency department at Bluefield Regional Medical Center on November 12, 2002, with complaints of heel pain after falling on some steps.  (R. at 165-71.)  Evans denied any head injury, pain in his back, abdomen, pelvis or any other extremity.  (R. at 170.)  A physical examination revealed Evans to be in obvious pain.  (R. at 170.)  His right heel and foot were very swollen, tender and erythematous, but he could wiggle his toes with pain.  (R. at 170.)  A CT scan and x-rays of the right ankle revealed a fractured calcaneus and a fractured navicular bone on the right.  (R. at 167-71.)  On November 19, 2002, a duplex ultrasound of the right

Case 1:05-cv-00052-PMS   Document 27   Filed 02/28/06   Page 11 of 24   Pageid#: 109

lower leg revealed normal deep veins. (R. at 166.) Evans was treated conservatively. (R. at 165.) By December 19, 2002, and January 16, 2003, Dr. Litz encouraged progressive weight bearing as tolerated. (R. at 161-62.)

Evans saw Dr. Edward Hunter, M.D., on March 25, 2003, for an evaluation of his right elbow, bilateral knee, bilateral ankle and hip pain at the request of the Virginia Department of Rehabilitative Services. (R. at 174-77.) X-rays of the knees, taken the previous day, yielded normal results. (R. at 172-73.) A physical examination revealed a normal range of motion of the back with no spinous process tenderness, paravertebral muscle spasm or tenderness, kyphosis or scoliosis. (R. at 176.) Straight leg raising was negative to 90 degrees bilaterally. (R. at 176.) Evans's grip strength was normal bilaterally, and he exhibited no tremors or involuntary movements. (R. at 176.) His gait was normal, as was his lower extremity strength and deep tendon reflexes bilaterally on both upper and lower extremities. (R. at 176.) Proprioception[8] was intact in the distal lower extremities and plantar responses were downward. (R. at 176.) Sensation to light touch was intact in all extremities. (R. at 176.)

Dr. Hunter diagnosed various multiple joint aches and pains without evidence of muscle impairment. (R. at 176.) He opined that Evans did not have any appreciable limitations on his abilities to creep, to crawl, to crouch, to climb, to stoop, to bend, to lift, to carry, to travel, to speak or to hear, nor did he find any mental limitations on Evans's capacities for understanding, memory, sustained concentration

---

[8]Proprioception refers to perception mediated by sensory nerve terminals which give information concerning movements and position of the body. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1366 (27th ed. 1988.)

and persistence, social interaction or adaptation. (R. at 176-77.) Dr. Hunter also completed a Range of Motion Form, indicating that Evans had some decreased range of motion in the right ankle, and he noted mild crepitus of the right knee. (R. at 178-79.)

On March 27, 2003, Dr. Litz administered an injection into Evans's right ankle. (R. at 193.) However, on April 10, 2003, Dr. Litz noted that the injection was not helpful, and he recommended that Evans use a stationary bike to increase flexibility and begin better weight bearing. (R. at 192.) Evans was advised to remain off of work for three to six months in light of osteoporosis noted on x-rays. (R. at 192.) On May 22, 2003, Dr. Litz noted that Evans appeared to be improving. (R. at 191.) Lortab was prescribed, and Evans was encouraged to perform passive range of motion exercises of the subtalar joint space. (R. at 191.)

On April 9, 2003, Dr. Frank M. Johnson, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, indicating that Evans could perform light work diminished by a limitation on his ability to push and/or pull with his lower extremities due to his knee problems. (R. at 180-87.) Dr. Johnson further found that Evans could never climb ladders, ropes or scaffolds, but could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 183.) He imposed no manipulative, visual, communicative or environmental limitations on Evans. (R. at 183-85.) Dr. Johnson opined that Evans's allegations were only partially credible based on the medical evidence of record. (R. at 186.) Specifically, he noted that, despite pain in the knees, Evans retained normal strength and reflexes. (R. at 186.) Dr. Johnson opined that, based on the medical evidence of record, Evans should be capable of light work diminished by a limited ability to push

-13-

and/or pull with the lower extremities. (R. at 186.) This assessment was affirmed by Dr. Richard M. Surrusco, M.D., another state agency physician, on June 18, 2003. (R. at 187.)

Evans presented to the emergency department at Bluefield Regional Medical Center on July 9, 2003, with complaints of twisting his mid back the previous day. (R. at 15-16.) It was noted that Evans had a full range of motion of the lumbosacral spine, was able to move side-to-side without difficulty, and he exhibited normal deep tendon reflexes with good lower extremity strength. (R. at 15.) Evans was diagnosed with back strain and received a Toradol injection and prescriptions for Motrin and Flexeril. (R. at 15.) On February 21, 2005, he again presented to the emergency department with complaints of low back pain after abruptly jumping out of bed. (R. at 13.) He rated his pain as a six on a scale of one to 10, with 10 being the worst pain. (R. at 13.) Evans exhibited tenderness in the L4, L5 and S1 areas of the spine and pain in the paraspinous muscles. (R. at 13.) Very tense paraspinous muscles were noted on the left side. (R. at 13.) Evans was unable to lie on the exam table to attempt straight leg raising, and he could bend forward only slightly with significant pain. (R. at 13.) He was diagnosed with lumbosacral strain, received a Toradol injection and was prescribed Lortab and Flexeril. (R. at 13.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1)

-14-

is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2005).  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 8, 2005, the ALJ denied Evans's claims. (R. at 20-30.)  The ALJ found that the medical evidence established that Evans suffered from severe impairments, namely post ankle fracture, arthritis, left knee problems, mild tennis elbow, mild crepitus of the right knee and back problems, but she found that Evans did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 29.)  The ALJ found that Evans retained the residual functional capacity to perform light work that allowed him to occasionally make postural adaptations diminished by a

-15-

limited ability to use the lower extremities and knees, and a limited ability to climb ladders, ropes and scaffolds. (R. at 29.) Thus, the ALJ found that Evans was unable to perform any of his past relevant work. (R. at 29.) The ALJ found that, based on Evans's age, education and past work experience and the testimony of a vocational expert, Evans could perform jobs existing in significant numbers in the national economy, including those of a taxi driver, a watchman/night guard, a parking lot attendant, a file clerk and a general office clerk. (R. at 29-30.) Therefore, the ALJ found that Evans was not disabled under the Act and was not eligible for benefits. (R. at 30.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Evans argues that the ALJ erred by failing to adequately develop the record by sending him for a consultative examination as promised at his initial hearing,[9] particularly given the fact that he was not represented by counsel, and instead opting

---

[9]I note that, despite Evans's contention, the ALJ did not promise to obtain a consultative examination at Evans's initial hearing.

to utilize the services of a medical expert at his supplemental hearing in making her disability determination. (Brief In Support Of Plaintiff's Motion For Remand, ("Plaintiff's Brief"), at 5-8.) Evans further argues that the ALJ erred by failing to consider the evidence contained in the record that he could not afford to obtain further testing and treatment due to his financial circumstances. (Plaintiff's Brief at 12-13.) Next, Evans argues that the Appeals Council erred by failing to delay its decision on his request for review pending the submission of allegedly new evidence in the form of a consultative evaluation from Dr. Robert P. Kropac, M.D., an orthopaedist, performed on May 9, 2005. (Plaintiff's Brief at 8-9.) Finally, Evans argues that the ALJ erred by mischaracterizing the evidence in her decision. (Plaintiff's Brief at 9-13.)

Based on the following reasons, I will grant Evans's Motion For Remand. Evans first argues that the ALJ erred by failing to adequately develop the record, especially since he was unrepresented at both hearings. (Plaintiff's Brief at 5-8.) It is well-settled that the ALJ does, indeed, have a duty to help develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). In *Cook*, the court stated that "... the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." 783 F.2d at 1173. The regulations require only that the medical evidence be "complete" enough to make a determination regarding the nature and effect of the claimed disability, the duration of the disability and the claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1513(e), 416.913(e) (2005).

There are several references contained in the record to Evans's need for further testing, treatment and/or surgery. For instance, in July 1999, Dr. Chand recommended further testing of Evans's right knee to determine whether he had a torn anterior cruciate ligament. (R. at 144.) He also recommended that Evans undergo physical therapy. (R. at 144.) Nonetheless, Evans declined both due to a lack of insurance. (R. at 144.) Again, on March 29, 2000, Dr. Chand advised Evans to obtain an MRI of the right knee, as well as surgical treatment, but Evans again declined. (R. at 143.) On April 21, 2000, Dr. Chand yet again advised Evans of the need to undergo investigative studies or arthroscopic surgery of the right knee. (R. at 142.) However, Evans informed him that he could not afford to do so. (R. at 142.) Dr. Chand again recommended surgical intervention of the right knee on June 7, 2000. (R. at 141.) Finally, on August 16, 2000, Dr. Chand noted that because he could not continue to indefinitely prescribe pain pills to treat Evans's right knee impairment, that he must, therefore, learn to live with his condition unless he wished to pursue surgery at some future date. (R. at 140.) Likewise, in April 2003, regarding Evans's ankle impairment, Dr. Litz noted the presence of evidence of osteoporosis based on x-rays. (R. at 192.)

At Evans's initial hearing, the ALJ noted the paucity of the medical evidence submitted by Evans in support of his claims. (R. at 208-09.) She fully realized Evans's status as an unrepresented claimant and advised him of his right to representation. (R. at 206-08.) When Evans explained that he had attempted, but failed to obtain such representation, she explained that he needed to obtain his pertinent medical records and held the record open for two weeks pending a subsequent supplemental hearing. (R. at 264.) The ALJ further noted that the record

-18-

suggested that Evans suffered from various impairments, but that it was incomplete in terms of specific diagnoses and their effect on his ability to perform work-related activities. (R. at 262-63.) Evans testified that he had been unable to obtain health insurance and that he could not afford further testing or surgery. (R. at 210-15.) The ALJ noted that a consultative examination might be in order. (R. at 262-65.)

The regulations provide that if a claimant's "medical sources cannot or will not give [the Social Security Administration] sufficient medical evidence about [claimant's] impairment ... to determine whether [claimant is] disabled ... [claimant] may [be asked] to have one or more physical ... examinations or tests ... [that] [w]e will pay for. ..." 20 C.F.R. §§ 404.1517, 416.917 (2005). According to 20 C.F.R. §§ 404.1519a, 416.919a, the decision to order a consultative examination will be made after giving full consideration to whether additional information needed, such as clinical findings, laboratory tests, diagnoses and prognoses, is "readily available from the records of [claimant's] medical sources." Sections 404.1519a, 416.919a further provide that the Social Security Administration "will ... use a consultative examination to secure needed medical evidence the file does not contain such as clinical findings, laboratory tests, a diagnosis or prognosis necessary for decision."

Here, I find that the medical records submitted by Evans contained references to the need for further investigative studies, treatment and surgery, but that Evans could not afford to obtain such. I further find that the ALJ was made fully aware of these circumstances at the initial hearing on December 11, 2003. It is well-settled that social security benefits may be denied if a claimant unjustifiably refuses treatment. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); 20 C.F.R. §§

-19-

404.1530(b), 416.930(b) (2005). However, the Fourth Circuit noted that DIB and SSI benefits exist to give financial assistance to disabled persons because they are unable to sustain themselves. *See Gordon*, 725 F.2d at 237. Thus, the court held that "[i]t flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him." *Gordon*, 725 F.2d at 237.

For all these reasons, I find that the requirements for ordering a consultative examination under the applicable regulations were met and that the ALJ erred by not securing a consultative examination to further assess Evans's knee and ankle impairments. Although the ALJ did arrange for the testimony of a medical expert at Evans's supplemental hearing, I note that this is no substitute for a consultative examination. A medical expert does not examine the claimant and, therefore, simply cannot provide the missing clinical findings, laboratory testing or the like that a consultative examiner can. Thus, I will grant Evans's Motion For Remand on this ground.

Evans next argues that the Appeals Council erred by failing to delay its decision on his request for review based on his representation that he had arranged a consultative examination with Dr. Kropac. According to 20 C.F.R. §§ 404.970, 416.1470, the Appeals Council will review a case if new and material evidence is submitted if it relates to the period on or before the date of the ALJ's hearing decision. If so, then the ALJ shall evaluate the entire record including the new and material evidence submitted. *See* 20 C.F.R. §§ 404.970, 416.1470 (2005). Here, Evans requested that the Appeals Council delay its decision on his request for review

pending the submission of allegedly new evidence from Dr. Kropac. He submitted two emergency room notes dated July 9, 2003, and February 21, 2005, along with his request for review. I first note that I can find no authority to support a conclusion that the Appeals Council must honor, or even consider, such a request. Moreover, according to *Wilkins,* 953 F.2d at 95-96, the "Appeals Council must consider evidence *submitted with the request for review* in deciding whether to grant review 'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.'" (quoting *Williams v. Sullivan,* 903 F.2d 214, 216 (8th Cir. 1990)). Evidence is new within the meaning of 20 C.F.R. §§ 404.970, 416.1470 if it is not duplicative or cumulative. *See Wilkins*, 953 F.2d at 96 (citations omitted). Evidence is material if there is a reasonable probability that the new evidence would have changed the outcome. *See Wilkins*, 953 F.2d at 96 (citing *Borders v. Heckler*, 777 F.2d 954, 956 (4th Cir. 1985)). Here, as previously mentioned, the evidence from Dr. Kropac was not submitted with the request for review.

Moreover, I find that it is impossible to determine from the record whether such evidence from Dr. Kropac is new, material and/or related to the appropriate time period. Although Evans, in his brief, states certain findings allegedly made by Dr. Kropac in May 2005, this evaluation has not been included in the record on appeal, nor has it been subsequently submitted to this court for consideration. Without reviewing Dr. Kropac's evaluation, it is impossible to determine whether this evidence should be considered in making the disability determination. More specifically, it is impossible to determine whether Dr. Kropac's evaluation is new, if so, whether it is reasonably probable that it would have changed the ALJ's decision

and whether it is relevant to the time period on or before March 8, 2005. Therefore, on remand, Evans is directed to submit this evaluation for the ALJ to determine whether it is, in fact, new, material and related to the appropriate time period. If so, then the ALJ is directed to consider it along with the other evidence of record on remand.

As regards Evans's alleged back and hip impairments, I find that substantial evidence supports the ALJ's finding that they were not disabling. Evans testified that he received treatment for his back and hip pain from various emergency departments. (R. at 228-29.) He stated that he had seen no specialists. (R. at 229.) In April 1999, Evans presented to the emergency department with complaints of back pain radiating into his legs. (R. at 157-60.) Straight leg raising was negative, no motor or sensory deficit was noted and his reflexes were normal. (R. at 158.) Evans's extremities were normal without evidence of pedal edema. (R. at 158.) He was diagnosed with low back pain and given Toradol. (R. at 158, 160.) In July 1999, Evans exhibited right hip movement without pain. (R. at 144.) In March 2000, he denied back or left hip symptoms. (R. at 143.) In March 2003, Dr. Hunter noted that Evans had a normal range of motion of the back with no spinous process tenderness, paravertebral muscle spasm or tenderness, kyphosis or scoliosis. (R. at 176.) Straight leg raising was negative to 90 degrees bilaterally. (R. at 176.) His gait was normal, as were his lower extremity strength and deep tendon reflexes bilaterally. (R. at 176.) Dr. Hunter diagnosed various multiple joint aches and pains without evidence of muscle impairment. (R. at 176.) As previously mentioned, Dr. Hunter noted that Evans had no appreciable physical limitations. (R. at 176.) On the Range of Motion Form, Dr. Hunter indicated that Evans had a normal range of motion of the back and hips. (R.

at 178-79.)  Also as previously mentioned, the state agency physicians indicated that Evans was capable of performing a limited range of light work.  (R. at 180-87.)  For all of these reasons, I find that substantial evidence supports the ALJ's finding that Evans did not suffer from a disabling back or hip impairment.

I also find that substantial evidence supports the ALJ's finding that Evans did not suffer from a disabling elbow impairment.  The only evidence contained in the record regarding Evans's elbow impairment is a note from the emergency department dated January 8, 2002.  (R. at 153-56.)  At that time, Evans complained of mild to moderate right elbow pain after chopping wood the previous day.  (R. at 154-56.)  However, Evans had a normal range of motion of all extremities.  (R. at 154.)  He was diagnosed with muscle strain of the right elbow area.  (R. at 153.)  Evans was treated conservatively with medication, ice and warm compresses.  (R. at 153.)  On March 25, 2003, Dr. Hunter noted that Evans's deep tendon reflexes of the bilateral upper extremities were normal.  (R. at 176.)  He noted no appreciable physical limitations, and he noted a normal range of motion of the elbows bilaterally.  (R. at 176-78.)  In April 2003, the state agency physicians found that Evans could perform a diminished range of light work.  (R. at 180-87.)

Based on the above disposition, I find it unnecessary to address Evans's remaining argument that the ALJ mischaracterized the evidence.

## IV. Conclusion

For the foregoing reasons, Evans's Motion To Remand will be granted, the

-23-

Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated and the case will be remanded to the Commissioner for further consideration consistent with this Memorandum Opinion.

An appropriate order will be entered.

DATED:    This 28th day of February 2006.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE